FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

00 MAY -3 AM 9:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES OF AMERICA,

    Appellant,

vs.                  CASE NO. CV-99-J-1447-NE

W. DAVID FRETZ,

    Appellee.

ENTERED

MAY  3 2000

## MEMORANDUM OPINION

    This matter is before the court as an appeal from the Bankruptcy Court, pursuant to

28 U.S.C. § 158(a).  The parties have filed appellate briefs, which the court has reviewed.

This court specifically finds that the issues presented in this case are extremely simple and

that oral argument would only delay entry of a ruling on appeal. This court finds, in

accordance in B.R. 8012, that the facts and legal arguments are adequately presented in the

briefs and record and the decisional process will not be significantly aided by oral argument.

Therefore, the appellant's request for oral argument is **DENIED**.

### Procedural History

    The appellee filed a Chapter 7 bankruptcy petition on July 14, 1997.  The matter went

to trial before the Honorable Jack Caddell on March 30 and 31, 1999.  The United States

26

contests the final judgment of the bankruptcy court finding that the appellee's unpaid taxes

for the years 1982-1992 were not excepted from discharge under 11 U.S.C. § 523(a)(1)(C).[1]

The bankruptcy court ruled from the bench, immediately upon the close of the trial,

that:

> The court does not feel, and we will issue a ruling, but does not believe that
> there has been a wilful attempt to evade the taxes during the years in question.
> I have read the law and I know the arguments that the parties could make here
> today, but in previous cases in the -- Ms. Murphy, you alluded to a previous
> case that I had decided in the IRS's favor on a Dr. Fontes (phonetic) ....
>
> I'm familiar with the one you're talking about , but I did do Dr. Fontes ... and
> he did have a great deal of bad faith laced throughout his case, his history, his
> previous filings.  He had had two or three, four previous filings and each of
> those filings, property was hidden and accumulated and set aside.  It was later
> discovered property put in wives' names, income that was not reported
> throughout the years.  The IRS did a profile of his lifestyle and it was obvious
> the profiles themselves – actually, this is a different case besides Fontes.
> Fontes had a great deal of bad faith and corruption throughout his history.  It
> wasn't quite as long as this ten years.  Had filed several different bankruptcies
> during the interim.  We had another case where the IRS put on profiles of the
> person's lifestyle and their accumulated wealth and had lived far beyond their
> means according to what they had reported and the Court imputed by that an
> intent to wilfully evade.  But the Court has seen this witness on the stand and
> I honestly – I think the best way I heard it was by Ms. Ziegenfelder.  I mean,
> she said she asked him why he didn't pay his taxes and she used these very
> words – if I can find them.  He thought, I didn't pay them because to hell with
> everything and that's the impression that this Court got of this individual
> throughout that ten year period.  He did not accumulate any wealth.  He didn't
> hide any property.  He didn't have any property off shore.  He didn't put
> property in other peoples' names.  It didn't appear that he took any lavish trips

---

[1]The appellant states the amount in question to be over $1 million dollars in federal income taxes including interest and penalties, but also admits that any penalties owed are dischargeable pursuant to 11 U.S.C. § 523(a)(7). *See* Brief for the Appellant at 2, note 1 and at 4.

or that his lifestyle was – he took a trip to England and another trip, but just short duration, that we could draw a profile and impute extravagance or greed or corruption. It just looked like during this ten years – and I have considered what he said about his alcoholism – and I know he wasn't qualified as an expert, but I think he could testify from his own experience of what alcoholism does to you and I was impressed by the fact that one of the – another thing Ms. Ziegenfelder brought out, that he came into the office voluntarily a year after his first encounter and came in and said, I just want to make amends to the people that I have offended and you're one of them. Now, I think the action she took was that they – it reopened her file and they went out to do enforcement, but, of course, she was just doing her job. But I just believe that this individual, his testimony was compelling of what he went through over the ten year span and we can look at the drawing there on the board of all these wives that he went through and the pain and the suffering that I'm sure he endured, they endured, the children endured, but I don't see any evidence under this case law, and granted, the government has shown some discrepancies in his most recent filing, but I don't think that they impute any degree of fraud that would relate back to the ten years that we're talking about. Number two, I don't really believe that they are material. They are – there's some indescrep – there are some discrepancies. The SouthTrust account, the – a couple of the items, but it doesn't appear to be any intent to hide property or to defraud the trustee. In looking at Dr. – I mean at the Page case where we had an alcoholic involved, that Judge Marler (phonetic) out of Arizona held that a debtor's failure to file returns as a result of alcoholism is not a wilful intent to evade taxes and, therefore, the debt is nondischargeable. And I think Dr. Fretz used a good term there, He said it just snowballed. Judge Wiedall (phonetic) in Chicago said that failure to timely pay tax liabilities must be the result of a wilful attempt to evade or defeat tax obligation. We didn't – he didn't take any wilful measures to defeat or evade. He just didn't file and he waited every day for the mail to come and finally, one day ten registered letters did come. But he wasn't running, he wasn't hiding, he wasn't concealing. Judge Pasquay in Florida said that without more the failure to file returns was not a wilful attempt to evade. I know there are cases on the other side and each case is fact specific and the facts in this case, I think that Dr. Fretz just – I've just used the term once – made a very convincing, compelling witness, that he just was of the opinion, to hell with everything. He was drinking huge quantities of liquor every day, virtually every day, and it permeated his entire, I believe, existence, his consciousness, his attitude and it seems to me that he's done a remarkable job of trying to turn it around and

resolve it and that's where the Bankruptcy Code comes in.  It allows a discharge of taxes that are – for which returns have been filed, and I don't think there's a contest even though there's the debate of whether these are voluntary or involuntary.  I think the law is clear that they do count toward either the two year period or the three year period.  And taxes older than the two year – or the three year, for which returns were filed, the Bankruptcy Code lets you get a fresh start.  Even though we're dealing with a million dollars here, that's a huge amount of money to write off, but at the same time, it's a huge amount to saddle on a person if they did not wilfully attempt to evade.  Congress sees fit to allow those taxes to be discharged unless they wilfully attempted to evade.  So, the Court just didn't find anything, any bad faith, any corruption or anything here other than just the fact that he drew his money and spent every penny he made and has absolutely nothing to show for it and he didn't live a lavish lifestyle.  He drove old cars and let– let, what, at least one house, maybe two, go back to foreclosure, didn't even take the equity and I think the point as made that it wasn't just the taxes, it was other obligations that he let go, his houses and – so, this is our opinion....

This witness, first of all, made a very truthful and good witness.  So, the government must then show circumstantial evidence that would show that there's something amiss.  And the government didn't seem to be able to have any facts here other than these discrepancies on his petition, which are, in this Court's opinion, we see these kind of things daily and the Court just does not find anything in these minor discrepancies here that would – even if the trustee had been demanding an overall denial of discharge under 727, the Court doesn't believe that the trustee could have prevailed on these minor omissions in his petition....

Trial transcript at 322-327 (hereinafter referred to as R. __).

The issues before this court are (1) whether the Bankruptcy Court erred in determining the appellee's federal tax liabilities for 1982 through 1992 are not excepted from discharge pursuant to Section 523(a)(1)(C) of the U.S. Bankruptcy Code and therefore dischargeable and (2) whether the Bankruptcy Court erred in not admitting two of the appellant's exhibits

4

into evidence, consisting of two letters from appellee's counsel to the bankruptcy trustee and to the attorney for appellant.

## Factual Background

The debtor, Dr. W. David Fretz, filed for bankruptcy in July of 1997 due to debts he could not pay, his largest creditor being the Internal Revenue Service. R. 17. At the time of trial, his debt owed to the IRS was over one million dollars. R. 17. Dr. Fretz testified that, if he paid everything he earned, he would not be able to pay the interest and penalties with his present salary, even if he paid no other bills. R. 17. At the time he filed for bankruptcy, the IRS had placed liens on his property and his son's home. Dr. Fretz also paid the IRS restitution. Shortly before trial, the IRS attached his IRA and bank account.[2] The IRS had already received the equity from the sale of the debtor's home. Within two weeks before trial, someone from the IRS called the debtor's ex-housekeeper to inquire about his wife's health. R. 18.

At the time of the trial, the debtor was renting a home. His net income was $7,200.00 per month, and he estimated his disposable income to be five hundred dollars per month. R. 19, 24. His wife suffers from a seizure disorder, osteoporosis, hypothyroidism, diabetes and dementia. R. 20. Because all of these are preexisting conditions for insurance purposes, the debtor spends several thousand dollars per month on her medical and pharmaceutical bills.

---

[2]The attachment was immediately dissolved by the bankruptcy court. *See* transcript of 1/27/99 emergency hearing at 15-16, 20-22. The court also enjoined the IRS until further hearing from filing another levy. Transcript of emergency hearing at 21-22.

R. 21. He also supports his mother and from time to time his son, who is mentally retarded. R. 21-22.

The debtor testified that his tax problems began when he went from being a paid employee to an independent contractor at the same time his drinking problem escalated, in 1982. R. 25, 42. He stated he did not plan or prepare for his taxes. R. 25. Dr. Fretz did not pay his federal income taxes for the years 1982-1992. He filed returns for each of these years in 1994. R. 26. He testified that he "just totally ignored" his obligations to the IRS because he was so devastated by his drinking that he was unable to focus on any financial responsibilities. R. 26. He never formed a plan to evade or defeat his taxes, and never formed a conscious affirmative decision to not file his returns in any of the years in question. R. 27. He did not try to hide any income nor assets, never opened a bank account outside the United States, never gave money or property to another person to hold or invest for him, never transferred money or property to a trust or into the name of another person, and never tried to convince the IRS he was not making any money or that he did not owe any taxes. R. 27-28.

By 1981, the debtor had been through three wives, three divorces and one bankruptcy.[3] R. 41, 156. He was fired from his job at the Anniston Medical Clinic, which he attributed to drinking excessively and publicly to the embarrassment of the clinic. R. 43,

---

[3]The first bankruptcy was filed in the mid-1970's in Kansas City. A second bankruptcy was filed in 1986 in Talladega, Alabama. R. 156-157.

44. At that point he went to Citizens Hospital in Talladega as an independent contractor. R. 44. He testified he did not know he had to pay quarterly estimated taxes. R. 44. The same year he also got divorced from his third wife and lost custody of his daughter. R. 45. From 1982 until 1992 he worked as an independent contractor at a variety of hospitals. He worked twelve to twenty-four hour shifts, and then would have several days off, which allowed his drinking to escalate.[4] His income was reported on a 1099. R. 49, 103-104.

From 1982 to 1992, Dr. Fretz handled all of his finances from crisis to crisis. During his marriage to his fourth wife, he abdicated all finances to her.[5] Bills did not get paid, his credit rating was wrecked, they were evicted from houses. He turned his paychecks over to her and did not keep track of what was paid and what was not. R. 74, 75.

He just quit paying on his house in Anniston, Alabama. Although he had equity in it, he made no effort to sell it and just let the bank have it back. R. 60-61. He made no effort to protect his financial interest in the house. R. 62. He handled his taxes in the same

---

[4]Dr. Fretz testified that he followed the same rules as pilots, he never drank within eight hours of a shift. R. 46. He described himself as a "top-shelf drunk" but over the years began to worry about being detected so he switched from cognacs to vodka because it has less smell. He testified that he lied to himself about his alcoholism. In the mid-80's, he began limiting himself to two drinks a day. To maintain that facade, he would drink two doubles at first, which graduated into bigger and bigger glasses. By the time he quit drinking, he has "a Go cup from the Quick Trip that I used to fix my drinks. I started having problems because the ice took too much room so I kept the vodka in the freezer and by the end I was using crystallized powder instead of mix so I wouldn't waste any of the space in the Go cup for my two drinks. So I would drink over a quart of virtually straight vodka every night before I passed out." He estimated he was spending several hundred dollars a week on vodka. R. 54-55.

[5]This was Barbara, whom he married in 1986. R. 63. She also drank heavily. R. 74.

manner, he just did not deal with them. R. 59-60. He filed bankruptcy in 1986. R. 60-61, 156-157. Although the IRS was listed as a creditor in that bankruptcy petition, he did not try to have the tax debt discharged. R. 61, 159. In fact, the plaintiff had an accountant in 1986 prepare his taxes, but he never filed the return because the forms were incorrect in that they did not account for all of his income. R. 117, 119. Thus, the filing of them would have been fraudulent. R. 119.

His next house, in Dothan, Alabama, was foreclosed in 1988 due to his failure to make payments on it. R. 64, 65. Dr. Fretz testified he knew he had to make his mortgage payments, he made sufficient money to make the payments, knew he could lose the house if the payments were not made, and knew the payments were not getting made. R. 67. He stated there was no rational explanation for his behavior. R. 68. His next house, in Andalusia, Alabama, was sold three or four years before the trial and all of the equity from that sale went to the IRS for back taxes. R. 69-70. Dr. Fretz estimated the equity to be twenty-nine to thirty thousand dollars. R. 20.

During this time period, the debtor did not belong to a country club, drove old cars, never owned a boat, never owned a second home, took two vacations during that entire time period, did not gamble, did not buy expensive jewelry, expensive furniture or clothes, did not buy fur coats for his wives, did not eat expensive food, did not spend money on parties or entertaining, and the only investment he made, in a car dealership, went "belly up." R. 77-78. He had no offshore bank accounts, bought less than $5,000.00 worth of stock, did not

8

invest in mutual funds and did not hide his money anywhere.  He has no money today that he earned during that time period, has no assets from that time period, and no annuities, retirement accounts or pensions from that time period.[6]  R. 80.  He also stated that his normal procedure was to never actual close an account, but just quit using it.  R. 224.

The first the debtor heard from the IRS regarding his nonpayment of taxes was a letter dated March 12, 1990 from Jane Ziegenfelder, informing him that an appointment had been set for him for March 26, 1990.[7]  R. 87, 107.  He did not attend this meeting.  R. 88.  Ms. Ziegenfelder testified that she asked him over the phone why he did not pay his taxes and the debtor replied that he had gotten a divorce and just said "To hell with everything."  R. 304. Sometime after that March, 1990 letter, the debtor received another letter from the IRS that the matter was being turned over to the criminal division.  He again did nothing in response. R. 108.  He was then notified that the criminal division wanted to interview him, so he hired a lawyer and went to the meeting.  R. 108.  The plaintiff was charged with criminal wilful failure to file his taxes (for 1988), to which he pled guilty and was sentenced in January, 1994. He served six months home incarceration, performed 400 hours of community service,

---

[6]The debtor had acquired $60,000.00 in an IRA since he became sober.  R. 80, 314.

[7] Although he never responded to the letter, after he was sober he went to see Ms. Zeigenfelder on his own accord.  R. 88, 110.

9

and paid restitution of $87,000.00.[8]  No fine was imposed because of his lack of assets.  R. 90-91.

The debtor stopped drinking on April 15, 1993.  He testified that through drinking, he destroyed his reputation, family, embarrassed himself professionally and "wasted the better part of my adult life in a meaningless fog of activities that gained me nothing except shame and sadness."  R. 29.   The plaintiff joined Alcoholics Anonymous six years before the trial and followed AA's twelve step program.  R. 32.   The debtor began holding AA meetings in County and City jails and worked with the Impaired Physician's Program in Alabama to help doctors who are still struggling with active alcoholism.  R. 36. He estimated he had counseled twenty-five to thirty alcoholics over the years.  R. 37.

The debtor testified that he maintained no records at all, that the copies of documents he has he obtained from the IRS.  R. 53. He testified that the focus of his life became the IRS, because his taxes had reached a "critical mass" but he realized he did not make enough money.  He stated he kept telling himself he would figure out a way to pay them eventually and procrastinated.  At some point, he realized he would never be able to pay them, and that to his drunken mind, his fears became magnified.  He envisioned himself being "drug out of the hospital in chains by the Internal Revenue Service and I thought that I would surely go to jail for years and I envisioned a scenario that was totally unrealistic in terms of what I thought

---

[8]In addition to the restitution and the equity form the Andalusia home, the debtor testified that the IRS also received an overpayment of $6,000.00 and an overpayment of $30,000.00, the latter being sometime in the 1980's.  R. 100.

my alternatives were.  I finally decided that the only thing I could do was kill myself.  And that was going to be my way to avoid any further shame and embarrassment was to die."  R. 55-56.  He testified that he finally found AA.  He described this as "when you're drinking you're continuously stacking a smelly mess in you're backyard.  When you quit drinking, that smelly mess doesn't go away.  It's still there and it has to be dealt with.  And that's what the AA program is about.  I couldn't make what was in my backyard go away.  I still owed my taxes, I still had a responsibility to confront the situation and I finally had a way of doing that through the AA program .... it gave me a beginning point where I could no longer stack more crap in the backyard and began to shovel a little bit at a time out of it."  R. 58.

     As part of the twelve step program, he met with Ms. Ziegenfelder to apologize for not responding to her at an earlier time.  He told her he was sorry to put her in the position where she had to pursue criminal action against him and that he knew it was not her fault, but his own responsibility.  Ms. Ziegenfelder's testimony corroborated the debtor's.[9]  R. 303.  She assisted him by getting together the information for the returns he signed with her. R. 89, 112.  Dr. Fretz testified that he just accepted the numbers the IRS placed on each of the forms for 1982-1992.  R. 114-117, 123-129.

     Dr. Fretz testified that he tried to "settle up" with the IRS in 1994.  He talked to Ms. Ziegenfelder about an offer and compromise and she referred him to a collection officer in

---

[9]Ziegenfelder testified at the trial that the debtor came to her office and told her that he was in a recovery program and that he had to make amends with people he felt he had wronged and wanted to thank her for helping him get his life straightened out.  R. 303.

11

Mobile. R. 98, 303.  Dr. Fretz states he was told that he made too much money for an offer and compromise and that the government's position would be that he had to continue to pay until he retired and then they would write off the remaining balance.  R. 98-99.

After Dr. Fretz signed a return for the tax years 1982-1992 in 1994, he received ten registered letters from the IRS, in March, 1995, seeking payment of the outstanding tax amount.  R. 130-131.  He testified that he piled the letters in the corner and cried.  R. 132. Thirty to sixty days later, he received further correspondence from the IRS stating its intention to levy.  R. 134.  A tax lien was placed against his retarded son's home.  According to the debtor, he co-signed the loan for the home, so the bank placed him on the deed.  Because of the tax lien, the son cannot sell the home, so the debtor had been making the payments on the mortgage.[10]  R. 134-135.

At the trial, the debtor testified that he did not pay his taxes "-- basically that came under the same as all my other responsibilities, I did not do it because of no particular reason. There was no structure in my life.  There was no organization.  I had no records to file from. I had no way to pay.  I was squandering the money on other things and I simply had no focus or appropriate priorities in my life at that time."  R. 136.   The debtor blames his alcoholism for his failure to file taxes.  R. 138.   He further explained

> If you are asking me, did the anxiety escalate because of the prior years, of course, it did.  It was a cumulative thing.  Initially, I had every intention of paying my taxes and I just procrastinated and thought at some point I would be

---

[10]This property was listed with the bankruptcy court in Schedule A Real Property.  R. 83.

able to do so.  By the late 1990's it was obvious that I would never make enough money to be able to pay those obligations and I – yes, I was terribly depressed.  It was a cumulative thing.... I just took an ostrich attitude that I would not do anything....

I simply did not file my returns and pay my taxes.  I never intended not to pay my taxes.

R. 285-286, 288.

## Standard of Review

The District Court sits as an appellate court in an appeal of a bankruptcy court decision. *In re Williamson*, 15 F.3d 1037, 1038 (11th Cir.1994). Sitting in its appellate capacity, the Court makes no independent factual findings. *Id.*  In accordance with Federal Rule of Bankruptcy Procedure 8013, the Bankruptcy Court's findings of fact will not be set aside unless clearly erroneous. *In re Chase & Sanborn Corp.*, 904 F.2d 588 (11th Cir.1990). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).  With respect to the bankruptcy court's conclusions of law, however, the Court applies a de novo standard of review. *In re Williamson*, 15 F.3d at 1038; *In re Chase & Sanborn Corp.*, 904 F.2d at 593.  De novo review required the court to make a judgment "independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *In re Sternberg*, 229 B.R. 238, 244 (S.D.Fla.1998); citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir.1984).

13

The proper construction of the Bankruptcy Code by the bankruptcy court or by the district court is a matter of law; accordingly, such interpretations are subject to de novo review. *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1374 (11th Cir.1994); *In re Taylor*, 3 F.3d 1512, 1514 (11th Cir.1993).

## Legal Analysis

### A. Did the Bankruptcy Court err in determining the appellee's federal tax liabilities for 1982 through 1992 were not excepted from discharge pursuant to Section 523(a)(1)(C) of the U.S. Bankruptcy Code and therefore dischargeable?

A debtor who files successfully under Chapter 7 of the Bankruptcy Code generally receives a complete discharge from pre-petition debts. *See* 11 U.S.C. § 727(b) (1994). Certain debts are, however, excepted from discharge. *See* 11 U.S.C. § 523 (1994). In particular, an express exception exists for federal income tax debts if the debtor has "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C).[11] The willfulness exception consists of a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness). As several other courts have noted, § 523(a)(1)(C) contains both a mens rea requirement ("willfulness") and a conduct requirement ("attempting to evade or defeat such tax"). *See, e.g., In re Birkenstock*, 87 F.3d

---

[11]11 U.S.C. § 523(a)(1)(C) provides:
    (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt--
    (1) for a tax or a customs duty--
    (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

14

947, 951 (7th Cir.1996).   To prove willfulness, the United States must prove, by a preponderance of the evidence, the nondischargeability of the debtor's federal income tax liabilities pursuant to 11 U.S.C. § 523(a)(1)(C). *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The Eleventh Circuit has held that the failure to pay taxes, without more, does not except a debtor from discharge. *In re Haas*, 48 F.3d 1153 (11th Cir.1995), rev'd after remand on other grounds, 162 F.3d 1087 (11th Cir. 1998).[12] In *Haas*, the Court focused on the conduct requirement and determined that Haas's conduct did not amount to an attempt to evade or defeat his tax liability. The conduct at issue in *Haas* was as follows: Haas had not concealed assets or otherwise evinced a motive to evade taxes; because of financial pressures, he had merely paid other debts, leaving the tax debt unpaid notwithstanding his knowledge thereof and ability to pay.   The Court notes that Haas "did not conceal assets, engage in dubious transfers of assets, falsify or destroy books or records, or misstate the amount of income in the respective years at issue." *Id.* at 1155.

Most circuits have held that a simple nonpayment of taxes does not satisfy § 523(a)(1)(C)'s conduct requirement. Thus, the Eleventh Circuit has concluded that mere knowledge of a tax debt, accompanied by nonpayment, could not render a tax debt nondischargeable under the exception. *In re Haas*, 48 F.3d at 1156. As the *In re Haas* court noted, "the defining characteristic of all debtors--honest and dishonest, alike--[is] insufficient

---

[12]*In re Haas* was ultimately reversed due to the plan being held to be nonconfirmable by the Eleventh Circuit. 162 F.3d at 1090.

resources to honor all of [their] obligations." *Id.* A broad reading of the exception--rendering nondischargeable any tax debts, except those "discovered ... in the course of ... bankruptcy proceedings," *id.* at 1155--would eviscerate the basic "fresh start" policy of the Bankruptcy Code for the "honest but unfortunate debtor." *Id.* at 1156. The court buttressed this conclusion by contrasting the language of the Chapter 7 exception with that of provisions of the Internal Revenue Code, which penalize "attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof." *Id.* at 1156- 57 (quoting 26 U.S.C. § 7201 (1994) and also looking to language of 26 U.S.C. §§ 6531(2), 6653, 6672 (1994)). "The omission of the words 'or payment thereof,'" from the bankruptcy exception, the Court concluded, "indicates that Congress did not intend that a failure to pay taxes, without more, should result in the nondischargeability of a debtor's tax liabilities in bankruptcy." *In re Haas*, 48 F.3d at 1157. Other courts have reached similar conclusions. *See In re Fegeley*, 118 F.3d at 983; *In re Birkenstock*, 87 F.3d at 951; *Dalton*, 77 F.3d at 1301. In *In re Griffith*, 206 F.3d 1389 (11th Cir. 2000), published while this case was pending before this court, the Eleventh Circuit reaffirmed the holding in Haas "that mere nonpayment of taxes is insufficient to establish the exception found in § 523(a)(1)(C).

The bankruptcy court in *Haas* found that Haas's tax liabilities for the periods at issue were dischargeable. It held that section 523(a)(1)(C) applied only to the assessment of tax liability and not to the payment thereof. Because Haas did not submit any materially false or misleading tax returns, the court concluded that Haas's failure to pay his taxes did not

16

constitute an attempt to evade or defeat his taxes under section 523(a)(1)(C). The government

appealed to the district court, which vacated the bankruptcy court's decision on the issue and

remanded the case for a determination of whether Haas's failure to pay was willful. On

remand, the bankruptcy court found that Haas made no affirmative attempt to evade or defeat

his taxes; rather, Haas used his income to pay debts other than his tax liability.[13]  The court

again concluded that Haas's tax liabilities did not fall within section 523(a)(1)(C)'s exception

to discharge.

The United States argued in its initial brief that the *Haas* decision is incorrect, and that

Eleventh Circuit has questioned this decision, citing *In re Griffith*, 174 F.3d 1222, *vacated*

182 F.3d 1297 (11th Cir.1999).[14]  The United States further states that the Eleventh Circuit,

---

[13]The bankruptcy court found:  Mr. Haas filed income tax returns for the years 1977
through 1985, but failed to pay the tax due in connection with the tax returns for 1977 through
1985. Mr. Haas did not engage in any conduct, either prior to or after the filing of the tax returns,
evincing an illicit motive to defeat or evade the taxes due for 1977 through 1985. Mr. Haas
readily acknowledged the tax liability and, other than his failure to pay the obligation, made no
attempt to defeat or evade his obligation. The debtors did not conceal assets, engage in dubious
transfers of assets, falsify or destroy books or records, or misstate the amount of income in the
respective years at issue. Instead of satisfying the tax liability, Mr. Haas used his income to pay
personal and business expenses rather than pay the taxes due. Mr. Haas was under financial
pressure and his nonpayment of the taxes was not the result of willful conduct designed to defeat
or evade the taxes; but, instead was the result of mistaking the priority and importance of certain
financial obligations. *In re Haas*, 173 B.R. 756, 758-59 (S.D.Ala.1993).

[14]The Court in *Griffith* stated:
Although we are bound by the decision in *Haas*, we are troubled by its application in this case.
As noted above, the underlying facts in *Haas* involved mere nonpayment of the tax, without
more. By contrast, in the instant case, Griffith fraudulently transferred assets to his wife to evade
the payment of his tax debts .... In *Dalton v. IRS*, 77 F.3d 1297 (10th Cir.1996), the Tenth
Circuit addressed a case identical to the instant case in all relevant respects. In dicta, the Tenth
Circuit indicated its agreement with the result reached in *Haas*--i.e., that the mere failure to pay a
tax, without more, would not rise to the level of tax evasion as required by § 523(a)(1)(C). Thus,
the result in *Haas*, could have been reached upon grounds much narrower than the ground

17

in *Griffith,* noted *Dalton v. Internal Revenue Service* reached a different conclusion than *Haas*

under similar circumstances. *Dalton,* 77 F.3d 1297 (10th Cir.1996). This court notes that

*Dalton* is not on point with the facts before this court, as in that case the debtor affirmatively

concealed assets. *See Dalton,* 77 F.3d at 1302. Since filing that brief, the Eleventh Circuit

entered its new decision *In re Griffith*, released March 24, 2000. The United States filed its

reply brief after this later decision in *Griffith* was entered by the Court.[15]

---

actually adopted by the Haas panel. [FN4 .... Underlying this narrower rationale is the notion that evasion requires some measure of fraud or something more than merely intentional nonpayment. *See Blohm v. Commissioner,* 994 F.2d 1542, 1554 (11th Cir.1993) (referring to liability under § 7201 for attempts to evade or defeat tax as "a criminal tax fraud conviction" and noting that "the elements of criminal tax evasion and of civil tax fraud are identical" (quoting *Gray v. Commissioner*, 708 F.2d 243, 246 (6th Cir.1983)) (emphases added)). *See generally Harry Graham Balter, Tax Fraud and Evasion* ¶ 2.01[1] (1983) (noting that "courts do not hesitate to use the terms fraud and evasion interchangeably and cumulatively").]

.... Relying upon the broad language of § 523(a)(1)(C)–"willfully attempted in any manner to evade or defeat such tax"--and in particular upon the broad phrase "in any manner," the *Dalton* court held that § 523(a)(1)(C) makes a tax nondischargeable when the debtor attempted to evade a payment or collection of the tax, even though there was no evasion with respect to the assessment thereof. *Dalton*, 77 F.3d at 1301. The Tenth Circuit also relied upon the purpose of Congress to relieve only "honest" debtors from their tax debts. *Id.* Finally, although noting the contrary ruling in *Haas* and in a single bankruptcy court decision, the *Dalton* court noted that most courts had applied § 523(a)(1)(C) to conduct constituting evasion of the payment of taxes, as well as conduct constituting evasion with respect to the assessment thereof. *Id.* at 1300-01.

.... Nor do we suggest that each of these provisions should be interpreted in the same way. We cite these provisions merely to demonstrate that the elimination of the phrase "or the payment thereof," which looks conspicuous when compared to the specific provisions that include that phrase, looks much less so when viewed in light of all of these provisions that differ in relatively minor ways.... The *Haas* panel acknowledged this point, but relied on the presumption that "Congress is ... aware of pertinent, existing law when it passes legislation." *See id.* (citations omitted). We suggest that this presumption is relatively weak, however, when the background law is the entire I.R.C., which encompasses fifteen volumes of the United States Code Annotated .... In short, we have some doubt about attaching too much significance to the lack of a four-word phrase in § 523(a)(1)(C). *Griffith*, 174 F.3d 1222, 1225-1227.

[15]Because of the substantial weight the United States attached to the issuance of the March 24, 2000 *Griffith* decision, this court granted the debtor's motion to respond to that reply

The day after the debtor here filed his response to the appellant-government's brief, the Eleventh Circuit entered a decision in *In re Griffith*, 206 F.3d 1389 (11th Cir.2000). Examining the question of whether § 523(a)(1)(C) renders a tax debt nondischargeable in bankruptcy where the debtor has willfully attempted in any manner to evade or defeat the payment of taxes, but has not willfully attempted to evade or defeat the assessment of taxes, the court held that a willful attempt to evade or defeat the payment of a tax did render the same to be nondischargeable. *In re Griffith,* 206 F.3d at 1393. However, this court finds that this decision in *Griffith* does not substantially affect the outcome of this appeal as the Government wholly failed to establish any attempt by this debtor to willfully evade either the assessment or collection of his taxes. *See Griffith,* 206 F.3d at 1396 ("The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523 (citations omitted)."

The debtor before this court was found to not have concealed any assets by the Bankruptcy Court. As this is solely a factual determination, which this court finds supported by the record, and hence subject to the clearly erroneous standard, this court will not attribute concealment to this debtor. The sole issue before the Bankruptcy Court was whether Dr. Fretz willfully attempted to evade or defeat the taxes for the subject years.[16]   R. 3.

---

brief, as the *Griffith* decision was issued the day after the debtor's brief in this court was due.

[16]*See e.g.* Trial Transcript at 3 ("The government further concedes that Dr. Fretz did not make a fraudulent return under 523 (a)(1)(C)").  The debtor also testified that he had intended to pay his taxes. R. 285.

The question at issue in this case is whether a debtor's failure to pay his taxes, without more, constitutes a willful attempt in any manner to evade or defeat such tax under section 523(a)(1)(C).  The United States's argument before this court is that the debtor knew he had to pay his taxes, earned enough money to owe taxes and to pay his taxes, yet failed to pay them.  Brief of appellant at 7-8.  Accordingly, the appellant argues, the debt at issue here should be found to be nondischargeable under section 523 (a)(1)(C) because the failure to pay had to be willful, given the above.  This question was squarely before the Bankruptcy Court in this case.   This court finds both this issue and the facts of this case to be virtually indistinguishable from that before the Eleventh Circuit in *Haas*.  Unlike the distinction drawn by the court in *Griffith*, or in *Dalton,* the debtor here made no attempt to avoid payment of his taxes, he just did not do so.  *See e.g., Griffith,* 206 F.3d at 1391 (where debtor transferred his assets  pursuant to an antinuptial agreement and therefore insulated them from levy).  The debtor admits this behavior was irresponsible, but states that it simply fails to rise to the level of "willful" or "intentional."  Debtor's brief at 9.

The determination of this appeal thus turns on the meaning of the term "willful" as the same is used in 523 (a)(1)(C).  Generally, the plain meaning of a statute controls, "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (alteration in original) (*quoting Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973

(1982)). In the present case, the government maintains that the plain meaning of the phrase "willfully attempted in any manner to evade or defeat such tax," § 523(a)(1)(C) (emphasis added), is sufficiently broad to include a debtor's "voluntary, conscious, and intentional" failure to pay taxes. This is apparently based upon *In re Fegeley*, 118 F.3d 979 (3rd Cir.1997) and *In re Tudisco*, 183 F.3d 133, 136 (2d Cir.1999). This court again notes that neither of these cases are binding precedent upon this court.[17]

The United States thus argues that if a debtor had both an awareness of his duty to pay his taxes and the present ability to pay them but nonetheless failed to satisfy that duty, then

---

[17]In *Tudisco*, the Court noted:

To the extent that *In re Haas* and *In re Bruner* actually do conflict, we need not, however, decide between them. Because Tudisco engaged in more than "mere nonpayment," his conduct constitutes an attempt to evade or defeat taxes under either standard. His failure to pay his taxes was accompanied by a failure to file his tax returns, at least until 1992. While he may not have transferred assets or created shell corporations, *cf. In re Birkenstock*, 87 F.3d at 952 (finding the conduct element satisfied based on a failure to pay, a failure to file, and the creation of a shell trust); *Bruner*, 55 F.3d at 200 (finding the conduct element satisfied based on a failure to pay, a failure to file, a resort to an "inordinate number of cash transactions," and the creation of a "shell entity"), Tudisco did submit a patently false affidavit to his employer. On its face, the affidavit was clearly intended to establish Tudisco's exemption from income tax withholding. Under the circumstances, we conclude that the bankruptcy court's finding--that Tudisco attempted to evade or defeat federal income taxes--is not clearly erroneous.

.... At his trial, he retracted this statement and instead claimed that several years of research had led him to believe that he was not obliged to pay taxes. When asked to identify the sources that supported this conclusion, he responded with evasive answers such as "books" or "people that I met, travelers from different parts of the country," whose names he had long since forgotten. Given these facts, the bankruptcy court could reasonably have rejected his retraction. There is sufficient evidence to support the conclusion that Tudisco willfully sought to evade his federal tax obligations. The district court therefore properly affirmed the bankruptcy court's finding on this issue. *In re Tudisco*, 183 F.3d 133, 136-137 (2d Cir.1999).

the tax liability is nondischargeable under section 523(a)(1)(C).  The difficulty with this

interpretation of section 523(a)(1)(C) is that it effectively makes all tax debts

nondischargeable.  This argument has been previously addressed by the Eleventh Circuit:

> If every knowing failure to pay taxes constituted an evasion of taxes under
> section 523(a)(1)(C), then discharge of tax liability would be available only to
> those very few debtors who discovered their debts to the IRS in the course of
> their bankruptcy proceedings (footnote omitted).  Moreover, every debtor, at
> least in theory, has the present ability to pay his income or employment taxes;
> if a debtor did not have positive net income, then he would not have been
> assessed income or employment taxes in the first instance. The government's
> reading of section 523(a)(1)(C) would allow an exception to swallow the
> general rule of discharge for tax liabilities.

> Such an expansive reading of section 523(a)(1)(C)'s exception to discharge
> would contravene the Bankruptcy Code's purpose of allowing a fresh start
> for the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 285,
> 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *In re Miller*, 39 F.3d 301, 304
> (11th Cir.1994). Under the IRS's interpretation of section 523(a)(1)(C), the only
> honest debtor would be a debtor who is wholly unaware of her debt to the IRS.
> However, she also is an honest debtor who, fully cognizant of the debt that she
> owes to the IRS, uses her income to pay other debts instead. Her failure to pay
> the IRS is the result of not dishonesty but of the defining characteristic of all
> debtors--honest and dishonest, alike--insufficient resources to honor all of her
> obligations.  Similarly, Haas technically had the financial ability to pay his
> taxes, but he still lacked the resources to pay all of his debts. That he decided
> to use his limited funds to satisfy obligations other than his properly
> acknowledged income taxes does not render him a dishonest debtor, simply a
> debtor[18](footnote in original). A literal application of the government's "plain

---

[18]*See In re Sonnenberg*, 148 B.R. 35, 38 (Bankr.N.D.Ill.1992) (holding that IRS failed to
show that debtors willfully attempted to evade payment of their taxes under section 523(a)(1)(C)
despite the fact that debtors consistently filed their returns late and without payments while
leading a lavish lifestyle). The court in *Sonnenberg* emphasized that poor financial management,
not dishonesty, led to the debtors' failure to pay their taxes:
> In attempting to work through these difficulties, [debtors] acted with no particular
> intent to defeat any specific creditor, including the IRS. The Sonnenbergs'
> downward financial spiral, combined with the maintenance of a lifestyle

language" interpretation of section 523(a)(1)(C) would thus render the general rule of dischargeability of tax liabilities an empty letter and defeat the central purpose of the Bankruptcy Code. Consequently, we must look to other sources to guide our interpretation of the ambiguous provision.

*In re Haas*, 48 F.3d at 1154-1156. In *Griffith*, the Eleventh Circuit recognized that its holding in *Haas* that "the phrase 'attempt[s] in any manner to evade or defeat such tax' does not imply attempts to evade or defeat payment thereof," has created controversy. *Griffith*, 206 F.3d at 1393 (citations omitted). The Court then explicitly stated that it finds § 523(a)(1)(C) renders nondischargeable tax debts where the debtor willfully attempted to evade or defeat payment of taxes. *Id.* In this case, the debtor had no more than an awareness of his duty to pay taxes and the then present ability to pay them, but failed to satisfy that duty. In *Griffith*, the Court stated "we reaffirm our first holding from Haas that mere nonpayment of taxes is insufficient to establish the exception found in § 523(a)(1)(C)." *Griffith*, 206 F.3d at 1394. The Court further stated that "we now conclude that the more reasonable interpretation of § 523 (a)(1)(C) is that it renders nondischargeable tax debts where the debtor engaged in affirmative acts seeking to evade or defeat collection of taxes." *Griffith*, 206 F.3d at 1395. This court finds that the debtor here did not engage in any affirmative acts to avoid his taxes. This stands in stark contrast to the court's decision in *Griffith* where the debtor was found to have made fraudulent transfers to avoid payment of taxes. *Id* at 1396-1397.

---

inconsistent with their financial obligations, finally resulted in the bankruptcy petition which brings them before this Court. *Id.*

This court finds that the debtor's intent, upon which this case turns, is an issue of fact reviewed for clear error. The Bankruptcy Court found no willfulness in the debtor's failure to pay his taxes. Whether to infer the requisite intent is left to the bankruptcy court that presides over the case, because that court is in the best position to observe the witnesses and presentment of the evidence.[19] *In re Sheridan*, 57 F.3d 627, 634 (7th Cir.1995); *see also Shaheen*, 111 B.R. at 53 (where intent is at issue, the debtor's credibility is a substantial factor, and the bankruptcy court's assessment thereof is entitled to great deference); Fed. R. Bankr.P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *In re Bonnazio*, 91 F.3d 296, 302 (2d Cir.1996).

Section 523(a)(1)(C) was enacted to preclude the use of the Bankruptcy Code for purposes of tax evasion. In order to prevail under a section 523(a)(1)(C) exception, the government must prove that the debtor either underpaid taxes deliberately and with fraudulent intent or willfully attempted to evade or defeat a tax. *See Haas*, 48 F.3d at 1154. As to the issue of fraud, the debtor's failure to pay taxes, without more, is insufficient to satisfy the requirements of section 523(a)(1)(C). *See id.* at 1155; *Griffith*, 206 F.3d at 1395. Where the issue is the debtor's specific intent to evade payment of taxes, the burden of proof rests with the government by a preponderance of the evidence. *See Grogan*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The bankruptcy court's credibility assessment of testimony is

---

[19]The bankruptcy court stated that "each case is fact specific and the facts in this case, I think Dr. Fretz just – I've used the term once – made a very convincing, compelling witness..." R. 325.

entitled to deference unless clearly erroneous. *See Commercial Credit Corp. v. Reed*, 154 B.R. 471, 475 (E.D.Tex.1993) ("[A] Bankruptcy Court's assessment of the witnesses usually will not be held to be clearly erroneous"). *Range v. United States*, 1999 WL 314799, (S.D.Tex.1999). This court must give due regard to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Bankruptcy Rule 8013.

As a general matter, non-dischargeability under section 523(a)(1)(C) may be proven by demonstrating a pattern of willful concealment of assets; dealings in cash; the shielding of income; and frustration of tax collection efforts. *See e.g., Spies v. U.S.*, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *Korecky v. Commissioner*, 781 F.2d 1566 (11th Cir.1986); *In re Howard*, 167 B.R. 684 (M.D.Fla.1994). Other "badges of fraud" are significant and repeated understatements of income; failure to file tax returns; implausible or inconsistent taxpayer behavior; and failure to cooperate with the Internal Revenue Service. *See Binkley v. United States*, 176 B.R. 260, 264 (M.D.Fla.1994); *Eyler v. Commissioner*, 760 F.2d 1129, 1132-33 (11th Cir.1985); *In re Fleck*, 242 B.R. 188, 190-191 (M.D.Fla.1999).

The government makes much ado of the debtor's failure to state on job applications that he had an alcohol dependency problem. R. 144-150, 154-155. Further, the IRS seems to rely on the debtor's voluntary participation in the Physician's Recovery Network and lack of formal diagnosis as an alcoholic as some sort of evidence that the debtor is not an alcoholic. R. 151-152. The court finds the debtor's voluntary participation and lack of

diagnosis to be irrelevant to whether he is a recovering alcoholic and to add no weight to the government's argument that the debtor's failure to pay taxes due was willful.

The recent *Griffith* decision convinces this court that the law in this circuit is that § 523(a)(1)(C) "renders nondischargeable tax debts where the debtor engaged in affirmative acts constituting a willful attempt to evade or defeat payment of taxes." 206 F.3d at 1395-1396. As was noted by this court and the bankruptcy court, the debtor here took no action at all, at any time, to evade his taxes. He simply did nothing. He failed to pay for his homes, he failed to pay his taxes, he failed to keep a job, and today he has almost nothing to show for a lifetime of working as a doctor. This court cannot conceive of a more likely individual to fall within the category excepted from § 523 (a)(1)(C) nondischargeability.[20]

This court finds the government's argument that mistakes in the debtor's bankruptcy schedules filed in 1997 to support a conclusion of willfulness to be wholly unpersuasive. The court does not find the 1997 omissions to be relevant or substantial. These omissions were brought to the attention of the bankruptcy court, which found them to be inconsequential. R. 327. This court is unpersuaded otherwise.

---

[20]Again in stark contrast to the debtor in *Griffith,* this debtor was deemed to be an honest, credible witness by the bankruptcy court. R. 325. In *Griffith,* the bankruptcy court noted that "both Griffith and his wife Linda were 'evasive and lacked that ring of forthrightness reflective of an open and credible witness.'" *Id* at 1396.

### B. Did the Bankruptcy Court err in not admitting two of the appellant's exhibits into evidence, consisting of two letters from appellee's counsel to the bankruptcy trustee and to the attorney for appellant?

The IRS argues that the Bankruptcy Court erred in failing to admit two letters. Brief of Appellant at 53. Having reviewed the record, this court finds that the two letters in question were never offered as exhibits by the IRS. The debtor's counsel objected to the admission of the two letters, but counsel for the IRS had not offered the letters. R. 200. After an argument over whether the contents of the letters were hearsay, without ever requesting the same be admitted, counsel for the IRS stated "I won't refer to your letters, all right?" R. 202-203. The debtor's counsel then stated he did not want to "talk about or have anything to do with these letters admitted and it's not necessary because the actual pleading. It's already in front of the court." Counsel for the IRS then states "That's fine. And I can work from there." R. 203-204. Counsel for the IRS having failed to move for the admission of the letters, this court can find no error in the bankruptcy court's failure to admit the letters. *See* Rule 103, Fed. R. Evid. and Advisory Committee notes thereto ("Rulings on evidence cannot be assigned as error unless (1) a substantial right is affected, and (2) the nature of the error was called to the attention of the judge...").

## CONCLUSION

After reviewing the record, this court can find no efforts on the part of the debtor to evade or defeat any tax liability he owed. He simply did nothing at all. This court can find

no evidence to the contrary which was before the Bankruptcy Court.  This court, finding no

clear error of fact, and no error of law, **AFFIRMS** the judgment of the Bankruptcy Court.

**DONE** and **ORDERED** this the _____ day of May, 2000.


INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

28